# EXHIBIT A

Case 1:26-cv-03641-GHW    Document 1-1    Filed 05/01/26    Page 2 of 34

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| **PALM INVESTMENT MANAGEMENT PTE. LTD., TAKASHI SHIMOYANAGITA, YOHEI KITAZUMI, and YUJI MASAKI**<br><br>*Petitioners,*<br>*-against-*<br><br>**LIGHTHOUSE INVESTMENT PARTNERS LLC, and MAP 217 SEGREGATED PORTFOLIO, a segregated portfolio of LMA SPECIAL PURPOSE COMPANY**<br><br>*Respondents.* | **Index No.**<br><br>**VERIFIED PETITION FOR PRELIMINARY INJUNCTION AND A TEMPORARY RESTRAINING ORDER** |

Petitioners Palm Investment Management Pte. Ltd. ("Palm"), Mr. Takashi Shimoyanagita ("Takashi"), Mr. Yohei Kitazumi ("Yohei"), and Mr. Yuji Masaki ("Yuji") (each also a "Manager," collectively "Managers"), by and through their counsel, Florence Rostami Law, LLC, *respectfully* submit this Verified Petition seeking an injunction with temporary restraining order in connection with arbitration pursuant to CPLR §§ 7502 (a) and (c), 7503(c), 6311, and 6313 and allege, based on personal knowledge regarding their actions and upon information and belief for all other matters, as set forth below:

## PRELIMINARY STATEMENT

1.      Petitioners seek a temporary restraining order and a preliminary injunction to protect them from draconian restrictive covenants that, if enforced, will immediately force Palm out of business and render the Managers Takashi, Yohei, and Yuji unemployable as investment advisors. Two prospective opportunities have already informed the Managers that they will not proceed while the covenants as written preclude any conceivable business relationship in the

Managers' field and the threat of enforcement looms over the Managers and any entity that engages with them or Palm.

2.     The problematic restrictive covenants are contained in an April 1, 2025 Investment Advisory Agreement that was amended on November 2025 ("Agreement") between Petitioners and Respondent MAP 217 Segregated Portfolio, a segregated portfolio of LMA Special Purpose Company a Cayman Island segregated portfolio company ("Fund"). The Fund's investment manager Respondent Lighthouse Investment Partners LLC ("Lighthouse") is a third-party beneficiary of the Agreement ("Fund" and "Lighthouse" collectively "Respondents"). Lighthouse drafted the entire Agreement; the Managers were not represented by counsel.

3.     While the Agreement has only been in effect for one year, the Managers have been reliant on the Fund, Lighthouse, and its affiliates for nearly all of their income since April 2023 when Lighthouse lured them away from their then-employer. Since then, the Managers have employed their proprietary strategies as limited by the Fund's liquidity requirements and other parameters, to determine the investments of one subaccount of the Fund, known as MAP 217-10 ("Portfolio").  Lighthouse arranged for the Managers to perform this work at a Singapore licensed investment advisor for the two years it took for the Managers to obtain a license for Palm. The Managers established Palm, obtained its license, and set up its operations entirely at their own expense with no assistance or contribution from Lighthouse or the Fund. At Palm, the Managers continued to perform the same functions, for the same remuneration only now they were (unexpectedly and contrary to Lighthouse's promises) burdened with overhead.

4.     On February 19, 2026, Petitioners notified Respondents' representative of their intention to terminate the Agreement due to insufficient income to meet overhead costs. She responded by asserting that Palm and the Managers were not entitled to terminate except for cause

and demanded that the Managers terminate Palm's employees and join a Lighthouse affiliate as employees. Not coincidentally, Lighthouse's subsidiary in Japan was about to obtain its asset management license, which it did on March 26, 2026.

5.      The Managers rejected Respondents' attempt to strongarm them. In response, Lighthouse, began making purported due diligence requests of Petitioners while really fishing for an excuse to claim that Petitioners had breached the Agreement. On April 3, 2026, Lighthouse terminated the Agreement with immediate effect, citing an alleged breach by Palm and each Manager of their fiduciary responsibility to fairly allocate trades between the Portfolio and a very small, commingled fund managed by Palm with Lighthouse's express permission.

6.      Respondents' claims of breach are pretextual. Realizing that it is not financially possible for Palm and the Managers to continue to work for Respondents as they have been and that the Managers will not accept employment at Lighthouse's Singapore subsidiary, Respondents invented a reason to terminate the Agreement for cause and thereby impose the harshest version of its restrictive covenants.

7.      Respondents know that there was no unfair allocation. Among other things, the funds have vastly different strategies, different risk tolerances, and different liquidity rules. The Commingled Fund's positions are dwarfed by the positions taken for the Portfolio. Further the short-term performance differential that purportedly led Respondents to question Palm's allocation practices, coincided with the war in Iran and had started to reverse itself before Respondents terminated the Agreement.

8.      Respondents only benefit from dragging things out. In their termination letter, Lighthouse and the Fund demanded that Palm and each Manager adhere to the particularly harsh and expansive restrictive covenants that the Agreement imposes against them in the event of a for

3

cause termination by Respondents. They have declined Palm's proposal to appoint an independent auditor, acceptable to Lighthouse, to review its unfair allocation claim with the intention of resolving this dispute amicably and efficiently. Instead, Respondents insist that Petitioners provide them with detailed confidential information about the Commingled Fund, which would put Petitioners in violation of contractual obligations and regulatory requirements.

9.     The Agreement's restrictive covenants are unreasonably overbroad and unenforceable whether it is terminated for cause or without cause. In both cases the Agreement prohibits Palm and each Manager from:

a.  entering into any business relationship with any individual or business that has ever worked for or had any business relationship with Lighthouse, the Fund or their affiliates ***for three years*** ("non-solicitation covenant"); and

b.   soliciting any new clients or taking any employment ***for six months*** ("sit-out covenant").

and, in the event of a for cause termination, the Agreement goes even further by:

c.  ***forever*** prohibiting Palm and each Manager from managing, or being employed by any entity to manage, any separately-managed accounts, single investor funds, funds of one, or any investment vehicle that is not a pooled investment account unless, in its sole discretion, Lighthouse agreed to waive this restriction ("exclusivity covenant"), and

d.  removing the Fund's obligation to pay Petitioners during the sit out period and eliminating the possibility that Respondents would waive or shorten the sit out period.

4

10.     These covenants are extremely restrictive and unreasonable and have but one purpose, to eliminate Palm and each Manager from the market and prevent them from utilizing their skills and expertise with any other investment company. The Managers are compelled either to work for Lighthouse or seek alternative employment outside of their professional field.

11.     Under these restrictions, Palm is unable to continue operating, nor can the Managers pursue their chosen professions. The restrictive covenants allow Palm and the Managers to oversee a pooled investment vehicle which requires Palm and each Manager to directly solicit and receive funds from one or more investors. It is extremely challenging for a small start-up to secure sufficient investments in a pooled managed fund, both initially and over the long term, to sustain its operational requirements, especially because Lighthouse claims that Palm cannot approach any entity that also engages in separately managed account investments. Palm and the Managers lack of experience with pooled investment funds significantly increases the challenge to convince investors to entrust their funds with them. At the present, Palm's only realistic option for sustainability is to work with institutional investment companies to oversee separately managed accounts, otherwise it has to stop operating in May 2026.

12.     The Managers are Japanese nationals and residents of Singapore. They specialize in separately managed accounts focused on investments within the Japan equity markets. If Managers are unable to operate separately managed accounts, they will not find employment in investment management. Their proficiency, knowledge, skills, and experience are specifically tailored to serving institutional investors who aggregate funds from various investors and subsequently establish manageable individual accounts, which are assigned to either internal or external managers. Consequently, these Managers are qualified to work exclusively with institutional managers overseeing separately managed accounts. Hedge funds assess candidates by

5

closely examining their professional experience and performance relevant to each specific role they have held. Consequently, it is uncommon for hedge funds to recruit these managers for roles that differ significantly in function from their previous positions.

13. These covenants do not protect any legitimate interests of the Fund or Lighthouse as neither has ever provided any proprietary assets to Palm and the Managers and neither were they required to develop any such assets or investment algorithm for Lighthouse or the Fund. The Agreement explicitly acknowledges that Petitioners alone own the strategies they employed for the Fund. Palm and the Managers have only applied their own proprietary trading strategies and have never had access to any trading strategies the Fund or Lighthouse may have used for their other assets under management. Petitioners have no relationship with Respondents' investors and Lighthouse did not disclose their names to Petitioners. Respondents did not train Petitioners or otherwise make any investment in them. Respondents did not provide any proprietary infrastructure to the Managers. The Managers, not Respondents, spent the time and resources necessary to establish Palm and to register it as a licensed investment advisor in Singapore.

14. Palm and Managers never had any contact with any of the Fund's or Lighthouse's investors or potential investors and were never given the investor list. They only communicated with a handful of Lighthouse's employees who were Japanese.

15. Lighthouse is a global hedge fund that reportedly manages approximately $18.2 billion of investor funds. Consequently, the pool of individuals and entities that have worked with, invested in, or been affiliated with Lighthouse and the Fund, both currently and historically, comprises a substantial number of parties with whom Palm and the Managers are prohibited from conducting business for a period of three years. The breadth and scope of this covenant are exceptionally extensive.

6

16. Lighthouse initially lured these skilled professionals (Takashi, Yohei, and Yuji) from their stable employments by committing (falsely) to cover their overhead expenses after they obtained their own license. After efforts to continue collaborating with Lighthouse proved unfeasible for legitimate business reasons, Lighthouse intends to destroy their careers and livelihoods. This case represents an instance of a large business engaging in anti-competitive practices, which not only contravenes the public policy of this state and Singapore, but also has an immediate and irreparable effect on the livelihoods of the individuals involved. Such actions must not be endorsed.

17. The Agreement is governed by New York law and any disputes must be resolved through arbitration before the American Arbitration Association in the City of New York. The Agreement provides that a Party may immediately bring a proceeding seeking preliminary injunctive relief in a court having jurisdiction thereof.

**PARTIES**

18. Takashi Shimoyanagita is a Japanese citizen and resident of Singapore.

19. Yohei Kitazumi is a Japanese citizen and resident of Singapore.

20. Yuji Masaki is a Japanese citizen and resident of Singapore.

21. Palm Investment Management Pte. Ltd. is a domestic corporation of Singapore with its office in Singapore.

22. MAP 217 Segregated Portfolio a segregated portfolio of LMA Special Purpose Company (the Fund) is a Cayman Island segregated portfolio that is operated by Lighthouse from its Palm Beach Gardens, Florida, offices.

23. Lighthouse Investment Partners LLC is a Delaware limited liability company with its principal headquarters located in Palm Beach Gardens, Florida. Lighthouse has registered as a

7

foreign entity with the Secretary of the State of the State of New York. It has an office at 437 Madison Avenue, Suite 100, New York, New York 1002. Lighthouse is a large and influential hedge fund. MAP 217 is one of many funds managed under the Lighthouse group of companies.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction pursuant to CPLR § 7501 to enforce the Agreement's forum selection clause and issue provisional remedies.

25.     Additionally, this Court has personal jurisdiction over Respondents based on the Agreement's forum selection clause pursuant to which Respondents expressly agreed to arbitrate disputes arising from the Agreement in the City of New York.

26.     Furthermore, this Court has personal jurisdiction over Respondents because of their express agreement to New York as the venue for arbitration. "Venue presupposes that the court already has both subject matter and personal jurisdiction …." *Knight v. New York and Presbyt. Hosp.,* 42 NY3d 699, 703 [2024].

## STATEMENT OF FACTS

27.     Each of Takashi, Yohei, and Yuji have significant experience managing assets and trading in Japan's equity markets. Takashi has twenty (20) years of experience as a fund manager, with prior roles at BNY Mellon Japan and ACG Management Pte. Ltd., a Singapore-based hedge fund. Yuji has over twenty (20) years of expertise in fund management, having served at major Japanese asset managers and ACG. Yohei possesses approximately eight (8) years of experience as a fund manager, with previous positions at Nomura Securities and ACG.

28.     In April 2022, Takashi and Yohei were portfolio managers at ACG.  In November 2025, Yuji joined them from ACG.

8

Case 1:26-cv-03641-GHW    Document 1-1    Filed 05/01/26    Page 10 of 34

29.    In or about 2016, Lighthouse established the Fund, which has been reported to total approximately $1.2 billion. The Fund's directors are reported to be Sean McGould (Chief Executive Officer and founder of Lighthouse), Ben Browning (President), Robert Swan (Vice President), and Scott Perkins (Executive Managing Director).

30.    In 2022, Lighthouse launched Penglai Peak a multi-manager investment platform focused on Japan's equity markets and appointed Mr. Hiroshi Harada ("Harada"), one of its managing directors, as the project leader for establishing Lighthouse's subsidiaries in Japan and in Singapore to manage this platform.

31.    The Portfolio was established in or about April 2023 as a subaccount of the Fund to trade in Japanese equities. Lighthouse aggressively headhunted Japanese investment managers to manage the Portfolio.

32.    In or about 2023, Harada established LH Penglai Peak Co., Ltd. ("Penglai") in Japan, and LH Penglai Peak Pte. Ltd. ("Penglai Singapore") in Singapore. Based on public records, Penglai obtained its Japan asset management license on or about March 26, 2026—one week before Lighthouse terminated the Agreement. Based on public records, Penglai Singapore has also applied for an asset management license which may be issued within the next one to two months.

**Lighthouse Commits to Pay Overhead**

33.    Beginning in or about April 2022, when Takashi and Yohei were happily employed at ACG, Harada actively headhunted and persuaded them to leave their positions and work for Lighthouse. The pitch Harada made to Takashi and Yohei was extremely attractive. To entice these capable and skilled traders and investment advisors to leave their stable jobs, Harada promised that if Takashi and Yohei established an investment advisory entity to manage the Portfolio, Lighthouse would pay its overhead expenses and that in the time it took to obtain the necessary

9

capital management license, Lighthouse would arrange for them to work under a licensed investment advisor.

34. On August 31, 2022, Takashi, Yohei and Lighthouse executed a letter agreement pursuant to which Takashi and Yohei agreed to leave their positions at ACG in April 2023 and form their own investment company to manage the Portfolio, and in exchange, Lighthouse agreed to pay the overhead expenses of their company.

35. Thereafter, on a monthly basis, Harada contacted Takashi and Yohei and each time reiterated the same offer and encouraged them to accept the offer.

36. On or about April 6, 2023, Harada reiterated Lighthouse's promise and further stated that Lighthouse will pay all of their overhead expenses including, without limitation, payroll, pension contributions, and trade necessities including subscriptions to data-services such as Bloomberg and IFIS Consensus Data (a Japanese equity markets databank).

37. Subsequently, Takashi and Yohei, relying on Lighthouse's assurance to cover their overhead expenses, accepted the offer and resigned from their positions at ACG. Without this guarantee, neither would have considered managing an independent investment company.

38. As Takashi, Yohei, and Penglai did not yet possess investment management licenses in either Japan or Singapore, Lighthouse partnered with Gordian Capital, which has offices in Singapore. On May 19, 2023, Lighthouse entered into an agreement with Gordian Capital as its advisor and Gordian Capital agreed to permit Takashi and Yohei to manage the Portfolio using Gordian Capital's infrastructure.

39. On July 13, 2023, Yohei and Takashi incorporated Palm in Singapore and subsequently applied for its capital markets services license from the Singapore Monetary Authority of Singapore ("MAS").

10

40.     On or about November 14, 2023, during a Zoom videoconference with Takashi and Yohei, Harada again promised that once Palm commenced operations Lighthouse would cover Palm's overhead expenses for managing the Portfolio. He confirmed that Lighthouse will pay payroll of all personnel; research expenses including travel and hotel; office rent to accommodate 6 employees; sign-on bonuses; as well as a performance based fee.  Further, Harada stated that Lighthouse approved that Palm could also offer private equity and real estate investment products to other investors.

41.     In November 2024, Harada left Lighthouse and Penglai. After Harada's departure, Mr. Yohei Iwao ("Iwao") became the managing director of Penglai and, reportedly, began providing investment advice before Penglai obtained its investment management and trading license in March 2026. In December 2024, Ms. Keiko Kawauchi ("Kawauchi"), previously regional manager under Harada, was appointed managing director of Penglai Singapore. Iwao reports to Kawauchi.

**Palm Commences its Operation**

42.     After Palm received its capital markets services license on April 1, 2025, Palm, Takashi, Yohei and the Fund executed the Agreement for the management of the Portfolio.

43.     On April 1, 2025, Palm commenced its operations.

44.     Schedules A and C, appended to the Agreement, and Penglai's directive together established rigorous parameters that Palm was required to incorporate into its management strategies including: (a) a drawdown trigger at a peak-to-valley loss of 3%, resulting in a 30% Portfolio drawdown ($150 million); (b) limits imposed on the number of long and short positions; (c) limiting investments to only five specified instrument types; (d) stringent liquidity requirements, confining trading to securities with daily trading volumes of over approximately

11

¥300 million in a five (5) to sixty (60) day period to ensure the Portfolio could be liquidated within twenty days; (e) volatility parameters set between 2% and 4%; (f) mandated 50% utilization rate ($250 million at any time), which increased the Portfolio management's costs and imposed structural constraints on Palm; and (g) the liquidity obligation under Section 22(f) of the Agreement, requiring Palm to always be able to liquidate any open Portfolio position within twenty (20) days.

45.     Even under these strict parameters, the Managers performed their obligations and managed to increase the value of the Fund in 2025.

46.     Since the beginning (from May 2023), the Managers managed the Portfolio under the supervision of Penglai's management team. Penglai's managers, first Harada, and then Iwao, maintained real-time access to the data systems and actively and closely monitored the management of the Portfolio. Monthly, Takashi and Yohei participated in Zoom videoconferences with Iwao and several other Japanese-speaking managers at Penglai to report on and discuss their management of the Portfolio. Penglai ensured Palm's adherence to Lighthouse's comprehensive restrictions regarding liquidity risk, sector allocations, and exposure to individual equities.

47.     Following the commencement of Palm's operations, Yohei and Takashi made repeated requests for Lighthouse to fulfil its contractual obligations and cover Palm's overhead expenses. In response, Lighthouse employed delaying strategies until in or about November 2025, when, during a Zoom conference, Kawauchi stated that neither Lighthouse nor Penglai intended to honor their commitments under the letter agreement. However, she did not dispute the existence of the deal. At this point the Managers had already left their stable jobs and sunk significant resources into establishing Palm in reliance on Lighthouse's commitment.

12

48. Not only did Lighthouse renege on its commitment to cover Palm's overhead expenses; it only provided a performance-based fee of 17% (Schedule B to the Agreement), with no management fee included. The fees offered by Lighthouse are comparatively low within the industry.

49. Further, Lighthouse prohibited Palm from offering its services to other institutional investors. It argued that Section 19 (b) of the Agreement barred Palm and the Managers from managing other institutional investors' funds. In pertinent part, this section provided: "…commencing on the Execution Date until and unless Lighthouse has given prior consent or waived the terms of this Section 19(b) (the "Exclusivity Period") [Palm and each Manager] agree not to manage any capital or assets in the form of separately-managed accounts, single investor funds, 'funds of one' or any investment vehicle that is not a pooled investment vehicle, in which [Palm] is the investment manager or [Managers] act as the sole portfolio manager."

50. The fee structure and the restriction that barred Palm from offering the same service to other institutional investors resulted in severe financial difficulties for Palm.

51. To generate revenue to cover their overhead, Palm had no choice but to develop a pooled investment vehicle which for a small startup is difficult to market. Palm's efforts to attract investors further significantly hampered because Lighthouse demanded strict oversight and ultimately approval of Palm's marketing activities, effectively curtailing the promotion of the product. Palm had to obtain approval of Penglai after they reviewed Palm's list of marketing targets in advance and obtain permission from Penglai before making contact.

52. Lighthouse prohibited Palm from marketing this product to investors engaged in separately managed accounts—the market that was then—and even now very interested in working with Palm. For example, Palm could not market to companies such as Tokio Marine Asset

13

Case 1:26-cv-03641-GHW    Document 1-1    Filed 05/01/26    Page 15 of 34

Management. Ultimately, Palm focused its marketing efforts on entities that were clearly not engaged in separately managed accounts, such as family offices and high-net-worth individuals. For investors who might have been engaged in separately managed accounts, Lighthouse demanded to be informed and its approval was required. Furthermore, regarding capital introduction services provided by prime brokers (such as Goldman Sachs and Nomura Securities), Palm had to request that the prime brokers only introduce investors who were not engaged in separately managed accounts. Even investors who had not publicly stated that they were engaged in separately managed accounts had to be informed that if they were involved in separately managed accounts, Palm was prohibited from accepting investments from them. These unreasonable demands frustrated Palm's marketing ability and ultimately it only reached a very small number of investors,

53.    On or about September 29, 2025, Palm offered IMA-Alpha Strategy Fund_20250620: Commingled Fund ("Comingled Fund") to investors. However, to date, this fund attracted very little attention and is a fraction of the Portfolio's size of $500 million.

54.    On November 4, 2025, Palm, Yohei, Takashi, and the Fund executed the Amended and Restated Investment Advisory Agreement just to include Yuji as a Manager; otherwise there were no other changes to the Agreement.

55.    As the result of Lighthouse's breach of its agreement to pay Palm's overhead, in December 2025, Palm experienced a cash flow issue and its capital went below the threshold required capital of $250,000 under Singapore's law. On December 31, 2025, Palm self-reported its shortfall to the MAS, and by January 13, 2026, injected $50,000 into its capital account to bring it up to $270,000 to comply with the Singapore Securities and Futures Act 2001. The MAS did not issue a violation or make any findings in relation to this brief undercapitalization period.

14

Furthermore, neither Palm nor any of the Managers were prohibited from trading or managing the Portfolio.

56. During a Zoom videoconference with Kawauchi on February 19, 2026, Takashi and Yohei communicated that they were facing significant cash flow challenges and noted that Lighthouse's fee did not adequately cover their overhead expenses. They requested an amicable termination of the Agreement.

57. Kawauchi became hostile and adversarial. First she confirmed that Lighthouse had indeed been responsible for enticing Takashi and Yohei to leave their stable positions. Then she stated that Lighthouse *intentionally* did not include a term in the Agreement that gave Palm and the Managers the right to terminate for convenience; that Palm and the Managers were *intentionally* prohibited from terminating without cause. She further stated that the Agreement must remain in place during the duration of any legal dispute between parties. Kawauchi also stated that if Palm works for Lighthouse's competitors, Lighthouse will fight with Palm and will sue.

58. Kawauchi then offered to cover three to six months of overhead if Palm retained its three Portfolio Managers but dismissed all other staff; but only if the Managers agreed to dissolve Palm, join Penglai Singapore, and transfer the Commingled Fund to Penglai Singapore, if Palm was unable to manage its overhead after the three to six month period.

59. Palm and the Managers rejected this disingenuous offer.

60. Historically, the Portfolio experienced growth under the stewardship of Palm and the Managers. However, from January to mid-February 2026, the Portfolio struggled due to the underperformance of the information and communication and service sectors. Initially, form its inception on September 29, 2025 until mid-February 2026, the Commingled Fund's performance somewhat mirrored the performance fluctuations of the Portfolio. In the third week of February,

15

the Commingled Fund began outperforming the Portfolio which continued for a few weeks. By the beginning of April the Portfolio had begun to close the performance gap.

61.     Several unexpected principal events markedly affected Japan's equity markets from January to mid-March but they stemmed primarily from speculative activity, as opposed to fundamental market drivers such as earnings and revenue. Firstly, in January and early February, the market speculated that artificial intelligence (AI) will swiftly supersede software as a service; and therefore, stocks associated with AI and data centers experienced increased demand, while information and communication stocks became less favored.  Secondly, Prime Minister Takaichi's landslide victory on February 9, 2026, along with her party, led to a brief period of heightened expectations of political stability and substantial stimulus measures; and consequently, sectors related to domestic activity experienced significant growth. Thirdly, the conflict involving Iran in late February had an adverse impact on the export-oriented sector, resulting in a significant decline. However, given the speculative nature of these dynamics, accurately forecasting the duration of such surges was challenging.

62.     On February 26, 2026, on a Zoom videoconference, Takashi and Yohei discussed the Portfolio with Iwao and three other Penglai managers (Mr. Murakami, Mr. Aoyama, and Mr. Per). Takashi and Yohei offered a detailed analysis of the weak performance observed since the start of the year, addressed the unforeseen downspin in the micro-cap investments in the Japanese equity markets.  Penglai's managers remarked that the market environment had been extremely challenging for contrarian investment managers such as Takashi and Yohei, and accepted the explanation for the poor performance. Because the Portfolio's drawdown trigger was approaching, Takashi and Yohei recommended to temporarily mitigate risk by selling low-liquidity stocks and increasing the weight of mid-cap to large-cap stocks rather than investing in micro-caps.

16

Case 1:26-cv-03641-GHW Document 1-1 Filed 05/01/26 Page 18 of 34

63. Takashi and Yohei explained the factors behind their recommendation to shift to more liquid stocks. First, a factor analysis of Japan's small and mid-cap equity market in January and February 2026 showed that the liquidity factor was strongly positive—meaning stocks with higher trading volume performed well, while low-liquidity stocks with lower trading volume significantly underperformed. The Portfolio had a relatively high allocation of low-liquidity stocks, which was one of the contributing factors to its underperformance in January and February 2026. At the time of the meeting with Penglai on February 26, 2026, the Managers could not have predicted when this headwind will subside. As a result, Palm recommended to move to reduce risk by accelerating the disposal of low-liquidity positions. Additionally, the period from late January to mid-February is typically earnings announcement season in Japan, during which trading volumes tend to increase significantly around the time of results. If Palm did not reduce the low-liquidity positions during this window, liquidity would likely have deteriorated further thereafter, increasing the risk that Palm's selling activity would adversely impact stock prices when it attempted to exit those positions—thereby further damaging the Portfolio's performance. To avoid such a scenario, disposing of low-liquidity positions around the earnings announcement period was advantageous for the Portfolio's performance, and Palm recommended that they execute those disposals accordingly.

64. Trading volume fluctuates depending on timing. Even for the same position, a holding that could have been unwound within twenty (20) days before earnings results might no longer be fully unwound within twenty (20) days if liquidity deteriorates further after the announcement. In order to remain in compliance with the risk constraints under the Agreement, it was necessary to reduce low-liquidity positions to an appropriate level following earnings announcements.

17

Case 1:26-cv-03641-GHW    Document 1-1    Filed 05/01/26    Page 19 of 34

65.     Iwao and the other managers accepted the recommendations, and the Managers implemented this strategy.  None of the Penglai managers raised any concerns about unequitable trade allocation between the Portfolio and the Commingled Fund at this meeting.

66.     Following Penglai's approval of the strategy to control losses and ensure Lighthouse's liquidity requirements, Palm decreased the Portfolio's allocation in the information and communication, as well as services sectors. However, the holdings in these sectors remained substantial within the Commingled Fund due to its greater risk tolerance and lower liquidity requirements.

67.     Unexpectedly, in March 2026, the information and communication and services sector began to outperform other sectors and the significant outperformance of micro-cap stocks also provided a powerful tailwind for the Commingled Fund.

68.     These dynamics contributed to the performance gap observed between the Portfolio and Commingled Fund's performances in March 2026.

69.     On March 22, 2026 via email, purely based on speculation, Pollok accused Palm and the Managers of breaching the Agreement and their fiduciary duty to Lighthouse because of the perceived disparity between the result of the performance of the same strategies implement for the Portfolio and the Commingled Fund. Pollok did not identify any factual basis for his knowledge and indeed to date Lighthouse has refused to do so.

70.     Pollok demanded that no later than 5:00 p.m. EDT on March 25, 2026, Palm must provide complete and ***unredacted*** records pertinent to its operations of the Commingled Fund for the period February 1, 2026 to March 19, 2026 including, among others, the following:  detailed performance results for the strategies for the Portfolio and the Commingled Fund; a complete portfolio appraisal, including all positions and trading activities sourced from Palm's accounting

18

system, and order execution/management systems. Pollok's demand far outstrips the information that Palm is required to provide to Lighthouse under the Agreement.

71.    In essence, Pollok contended that, given that the Commingled Fund's value increased while the Portfolio's value declined over a few days in March 2026, the Managers must not have allocated favorable trades to the Portfolio. This position is without basis, and indeed, despite knowing that the Managers had not intentionally preferentially allocated positions to the Commingled Fund and their confidence that there had not been an inadvertent unfairness in the allocation, Palm investigation determined that the allegations were unfounded.

72.    Palm immediately investigated its records and determined that (i) the trades placed for the Commingled Fund could not have been allocated to the Portfolio due to the parameters set by Lighthouse and closely managed by Penglai; (ii) the shifts in macroeconomic factors from January to March 2026 could not have been predicted and therefore the Managers could not have taken steps to reduce the Portfolio's loss, and (iii) Iwao and others in Penglai may have engaged in ahead trading and front running trading.

73.    Penglai managed a subaccount of the Fund entitled MAP 217-20 ("Penglai Portfolio"). Palm discovered records indicating that Penglai may have placed trades for the Penglai Portfolio mirroring Palm's trades in the same direction, on the same day, and concerning the identical security.  Additionally, it discovered at least 68 cross-trades or wash trades placed by Penglai, each corresponding to Palm's trades on the same day but in opposite directions. Penglai may have improperly used Palm's confidential information, potentially impacting the performance of the Portfolio and its associated performance-based compensation. Penglai's use of Palm's strategies was an unauthorized and uncompensated use of Petitioners' proprietary trading strategy that the Agreement acknowledges is owned solely by Petitioners.

19

74.     Pollok's demand for unredacted documents would also result in disclosure of information subject to contractual and regulatory confidentially requirements and the names of the securities included in the long and short position for the Commingled Fund which were Palm's trade secrets.

75.     On April 1, 2026, in a 21-page memorandum sent via email to Pollok, Palm provided a thorough explanation of its trades for both funds and explained that each fund was subject to widely different investment parameters; and as such pursuant to the strict parameters set forth by Lighthouse, Palm was prohibited from allocating trades made for the Commingled Fund to the Portfolio. But Palm refused to provide unredacted documents or identify the name of the securities it traded for the Commingled Fund because doing so would violate Singapore regulations and its duties to the investors in the Commingled Fund. Further, Palm *notified* Pollok that it had identified trades placed by Penglai for Penglai Portfolio that may been in violation of applicable securities laws.

**Lighthouse Terminates Palm and the Managers**

76.     On April 3, without responding to any of Palm's explanations, on behalf of the Fund, Lighthouse terminated the Agreement. In the letter, Lighthouse accused Palm of material and "continuing" breaches of the Agreement for (i) failure to allocate investment opportunities in a fair and equitable manner in violation of Section 10(a) of the Agreement; (ii) failure to provide the documents that were demanded in violation of Section 14 of the Agreement; (iii) failure to comply with applicable regulations in violation of Section 16 of the Agreement. Lighthouse claimed that the breach by Palm qualified as a non-clean break and demanded that it was entitled to enforce the restrictive covenants under Section 19.

20

77.    Section 10(a) of the Agreement provides that Palm is obligated to allocate a particular investment to the Portfolio and its other clients "to the extent a particular investment (or disposition thereof) [*i.e.*, buy and sell] is suitable for [the Portfolio]." Because of different investment parameters, many of the investments in the Commingled Fund were not suitable for the Portfolio. This allegation of breach is false.

78.    Next, Lighthouse asserted that Palm had failed and refused to provide information expressly required under the Agreement in violation of Section 14.   However, Section 14 specifically requires Palm to provide ***information*** about the ***aggregate performance of the assets*** and products Palm manages but only upon ***reasonable request***. Pollok demanded all ***unredacted documents***. This allegation of breach is false.

79.    Lighthouse also claimed the termination was a non-clean break termination because Palm breached its obligations under Sections 16(b) of the Agreement. The definition of "non-clean break termination" incontrovertibly states that the only breach of the covenants of Section 16(b) that can serve as the basis for a non-clean break termination is a breach of Section 16(b)(viii), by which Palm covenants:

> Neither [Palm] nor any [Palm Affiliate] has ever been: (1) enjoined or sanctioned by any court or regulator in connection with any Investment-Related activity; (2) found by a court to have been involved in a violation of Investment-Related statutes or regulations; or (3) found by a Regulatory Authority or SRO to have: (A) made a false statement or omission; or (B) been involved in a violation of Investment-Related regulations or statutes, or SRO rules.

Palm does not have any affiliates.

80.    Lighthouse failed to identify any facts that fall within this representation and covenant.  But assuming it referred to the short period of undercapitalization, Palm self-reported to the MAS that its capital would slightly fall below the required threshold under Singapore law.

21

Subsequently, no later than January 13, 2026, Palm invested $50,000 and increased its capital by $20,000 over the required threshold. The MAS neither enjoined Palm and the Managers from investing and trading, nor sanctioned them in any way. Thus, at no point in time did Palm's representations become inaccurate.

81.    Palm had access to the records of the Portfolio's performance until April 6, 2026. Between April 1 and April 6, 2026, following the reversal of the market anomaly in Japan, the Portfolio's value experienced a significant increase. During the same period, the Commingled Fund experienced a far smaller percentage increase. The gap in performance between the two funds had already significantly narrowed by the time Palm lost access to the Portfolio's performance. This further illustrates that the two funds' different reactions to the unpredictable market fluctuations between mid-February and late March were not attributable to any deficiencies on the part of Palm or the Managers.

82.    Palm has offered to retain an independent investment administrator acceptable to Lighthouse to conduct an audit and investigate Lighthouse's claims – a common industry practice. Lighthouse has rejected Palm's offer. Indeed, Lighthouse is not interested in any investigation because it is well aware that its allegations are false.

**Enforcing the Restrictive Covenants Will Destroy Palm and Managers' Careers**

83.    Without a doubt Palm and each Manager will suffer imminent, continuing, and irreparable injury absent an order enjoining the enforcement of these draconian covenants.

84.    The exclusivity covenant in Section 19 of the Agreement provides:

> Save and except in the event the [Agreement] is terminated by [the Fund] or Lighthouse [without cause], then commencing on [April 1, 2025] until and unless Lighthouse has given prior consent or waived the terms of this Section 19(b) (the "Exclusivity Period") [Palm and the Manager] each agree

22

not to manage any capital or assets in the form of separately-managed accounts, single investor funds, "funds of one" or any investment vehicle that is not a pooled investment vehicle, in which [Palm] is the investment advisor or [Manager] acts as the sole portfolio manager.

85.     The sit-out covenant in Section 19(c) prohibits Palm and the Managers from soliciting any investors for six months without any compensation by Lighthouse. Garden leave period are compensated.

86.     The non-compete covenant of Section 19(b) bars for three years Palm and the Managers for any purpose to:

(i)     hire, solicit, recruit, induce, procure, work with, employ, or attempt to hire, solicit, recruit, induce, procure, work with, or employe, directly or indirectly, on behalf of the [Managers and Palm], any Lighthouse Protected Person.

(ii)    go into business with, accept capital from, invest capital with, act as a consultant for, or employe as a consultant, or solicit or attempt to solicit for the purpose of any of the foregoing, directly or indirectly, (A) any Lighthouse Protected Person; (B) any client, former client or business relationship of Lighthouse or any of its affiliates that was introduced to [Palm of the Managers], directly or indirectly, by Lighthouse or any of its affiliates; or (c) any former employee(s) of Lighthouse or any of its affiliates; or

(iii)   encourage any Lighthouse Protected Person to alter or terminate their relationship with [the Fund] or any affiliate of [the Fund] or Lighthouse.

87.     In Appendix 1 of the Agreement, Lighthouse Protected Person is defined as "any director, officer, employee or agent (excluding any third-party service provider unrelated to Lighthouse of [the Fund] or any affiliate of [the Fund] or Lighthouse, or any trader, investment advisor or portfolio manager hired or retained by [the Fund] or Lighthouse, or any affiliate of the [Fund] or Lighthouse, or any person who served in any of the foregoing capacities at any time during the term of the Agreement.

23

88.     If Lighthouse is not barred from enforcing these restrictive covenants against Palm, Palm will end its operation in May 2026 because it cannot cover its overhead, pay the Managers and its other employees, pay its CMS license fee, and meet its capital requirement. For Palm to stay in business, continue to serve its investors in the Commingled Fund and pay its employees, it must be able to work for institutional investors and service separately managed accounts that have offered to work with Palm.

89.     If Lighthouse is not barred from enforcing these restrictive covenants against the Managers, they cannot work in their chosen profession and must seek employment *elsewhere*. Takashi and Yuji have accumulated over two decades and Yohei has accumulated nearly a decade of experience in the management of institutional investors' funds—***not pooled funds***.  Should the covenants be enforced, they will need to seek employment in other industries—perhaps they can work with Japanese tourists in Singapore because hedge funds are unlikely to consider them for roles that require expertise outside their current area of experience.

90.     Takashi began his career in the asset management industry in October 2006 in a risk management role, which he held until October 2007. Since then, he has accumulated nearly twenty years of experience exclusively in Japanese equity portfolio management. Given the emphasis placed on relevant experience and track record in the job market, and considering his current age, he has no experience whatsoever in other functions such as sales, operations, or marketing within the industry. For Takashi, employment outside of portfolio management within asset management would therefore be extremely difficult. Furthermore, as noted below, transitioning to a long-position-only firm would also be very challenging, therefore, his employment opportunities are effectively confined to portfolio management roles at hedge funds. Indeed, since beginning work at ACG Management, and since Lighthouse terminated the

24

Agreement, the only positions introduced to Takashi by recruitment agents have been hedge fund portfolio manager roles—no introductions to other industries or functions have been made to him.

91.    Yohei worked in institutional equity sales at Nomura Securities in Japan and Nomura International in Hong Kong, during which time one of his key clients was ACG Management. In 2019, ACG Management recognized his fundamental analysis capabilities and recruited him, leading him to transition from the sell-side to the buy-side. The importance of equity sales has declined significantly since 2019, and the type of work he previously performed on the sell-side has largely ceased to exist as of 2026. Given his age and experience, returning to a sell-side role would be extremely difficult. His skill set is highly specialized in the niche field of Japan equity fundamental investing, and it would be difficult to apply these skills in other industries. A career transition to a different sector—including a return to the sell-side—is therefore not a realistic option for Yohei.

92.    Yuji began managing a Japan equity long/short hedge fund in August 2007 and has been engaged exclusively in this work for nearly twenty years, without having taken on any other roles in the interim. Given his age—in fifties—and the nature of his experience, transitioning to a different role would be extremely difficult.

93.    At this point in their careers, the employment opportunities available to each Manager in the asset management industry are limited to hedge funds that focus on Japanese equities and, more specifically, to the fundamental analysis-based investment approach in which each has experience. While there are other investment methodologies—such as quantitative analysis using mathematical models, commonly known as "quant" strategies—these Manager do not have any experience in those approaches, and the likelihood of finding employment at firms employing such strategies is virtually zero.

25

94.　Roles related to Japanese equity fundamental analysis and investment exist on both the buy-side (institutional investors) and the sell-side (securities firms). However, the nature of the work and the skill sets required differ substantially between the two. Each Manager has extensive buy-side experience, whereas his sell-side experience in Japanese equity investment is either non-existent or dates back to the distant past and was of limited duration. Employment on the buy-side is therefore the only realistic option for us.

95.　Even within the buy-side, there are various investment approaches. These include "long-position-only" investors, who hold only long positions without utilizing short selling, and hedge funds—such as ACG the one they have most recently been part of—which employ both long and short strategies. Within long-position-only investing, there are numerous styles, including growth investing, value investing (including activist funds), quality investing, and concentrated investing, among others. However, long-position-only managers have a strong and well-known tendency to avoid hiring candidates with hedge fund backgrounds. The long-position-only firm where they previously worked was itself reluctant to hire from hedge funds. This reflects a fundamental cultural difference between the two: hedge funds place a strong emphasis on generating positive monthly returns and frequently employ shorter-term investment approaches, whereas long-position-only managers generally evaluate performance over the medium to long term. As a result, candidates from hedge fund backgrounds—who tend to favor shorter-term fundamental analysis and valuation—are frequently screened out at the application stage for not fitting the culture.

96.　If the sit-out covenant is enforced, Palm will be destroyed. However, even the Managers will sustain severe hardship because they will not be able to earn a livelihood during the six months period unless they work with tourists.

26

**Equities Favor Palm and Managers**

97.     Lighthouse claims that enforcing these covenants are necessary to protect its legitimate business interests. It explains these business interests as follows: it conferred substantial competitive advantage on Palm by making a substantial committed capital to Palm (*i.e.* giving Palm *the privilege* of managing $500 million for Lighthouse), giving access to capital funding platform and infrastructure (*i.e.*, granting Palm *the privilege* to manage $500 million) and providing a vehicle through which Palm could deploy, scale, and monetize its strategies (*i.e.,* giving Palm *the opportunity practice its trading strategies* with $500 million of Lighthouse's investors). In sum and substance, Lighthouse argues that because it gave the Managers the opportunity to manage the Portfolio, they have accumulated credibility to attract Lighthouse's competitors. And, because, ostensibly, the Managers could not have otherwise gained this credibility, Lighthouse is entitled to destroy their careers.

98.     Lighthouse hounded Takashi and Yohei for one year with fraudulent promises to entice them to work for Lighthouse because they were skilled, experienced, and capable otherwise Lighthouse would have been gambling with investors' funds.

99.     Lighthouse did not provide any training, any proprietary algorithms, any proprietary infrastructure, any trade secrets, any list of client, or anything that Lighthouse could claim are its proprietary business interests the protection of which must trump the Managers and Palm's right to work in their chosen profession. In fact it is likely that the shoe is on the other foot—that Lighthouse's subsidiary Penglai may have misappropriated Palm's trade secrets.

100.     Lighthouse has no interest in pursuing a resolution because delays will serve its interest to either run these Manager out of the market or force them to accept its offer of employment. Rejecting Palm's offer to hire an independent administrator acceptable to Lighthouse

27

to investigate Palm's records to either refute or confirm Lighthouse's claim was a most reasonable and prompt resolution of this dispute. Lighthouse's rejection evidences that its desired outcome is destroying the Manager's careers.

101.    Lighthouse does not have a legitimate business interest the protection of which requires forever barring Palm and the Managers from engaging in their chosen profession.

102.    Each Manager executed the Agreement; therefore each Manager is personally bound by the terms of the Agreement. Equity requires that the Agreement between Lighthouse and the Fund and each Manager be treated as an employment agreement.

103.    It is extremely uncommon for a business entering into a service agreement with another business to require the managers—even owner-managers—of the service company to be individually bound by the terms of the agreement. Such an arrangement is considered atypical and may be perceived as overly aggressive.

104.    Lighthouse leveraged the fact that the Managers did not have any experience with contracting practices in the United States, and that, similar to many other Japanese professionals, they will not seek legal counsel before entering into an agreement. In fact, unlike most agreements between parties that have very unequal powers, the Agreement does not include a term that provides parties entered into this agreement after consulting with their own counsel.  Lighthouse was fully aware of the Managers' lack of legal representation and reflected this in its approach.

105.    To permit Lighthouse to stamp out Palm and destroy the Managers livelihood is a miscarriage of justice.

## **CAUSE OF ACTION**

106.    Petitioners repeat and reallege paragraphs 1 through 105 hereof, as if fully set forth herein.

28

107.    Petitioners seek a temporary restraining order and a preliminary injunction against Lighthouse and the Fund to enjoin them from enforcing the exclusivity covenant, the sit-out covenant, and the non-compete covenant.

108.    The covenants are broad and unreasonable and as such an impressible restraint on fair competition.  These covenants must not be enforced.

109.    ***First***, if they are enforced, Palm, and each Manager shall suffer irreparable, imminent, and continuing injury that cannot be remedied.

110.    ***Second***, there is a substantial likelihood that Petitioners will prevail on the merits of their claims against Lighthouse and the Fund, as neither party appears to possess a legitimate business interest warranting protection, and the covenants in question are overly broad to the extent that they conflict with the public policy of this State.

111.    ***Third***, the balance of equities favor Petitioners.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners respectfully request that this Court grant an Order, pursuant to Article 63 and 75 of the CPLR:

i.    pursuant to CPLR 7502(c):

    a.    enjoining the Respondents from enforcing the restrictive covenant set forth in Section 19(b) that provides: "Save and except in the event the [Agreement] is terminated by [the Fund] or Lighthouse [without cause], then commencing on [April 1, 2025] until and unless Lighthouse has given prior consent or waived the terms of this Section 19(b) (the 'Exclusivity Period') [Palm and the Manager] each agree not to manage any capital or assets in the form of separately-managed accounts, single investor funds, 'funds of one' or any investment vehicle that is not a pooled investment vehicle, in which [Palm] is the investment advisor or [Manager] acts as the sole portfolio manager" in its entirety; and

    b.    enjoining the Respondents from enforcing the restrictive covenant set forth in Section 19(c) that prohibits Petitioners from soliciting any new clients or taking any employment in their field for a period of six (6) months from the date Lighthouse terminated the Agreement (April 3, 2026), or in the alternative revising

29

this covenant as follows: Petitioners agree to a sit-out period of two months from April 3, 2026 without pay, or Petitioners agree to a sit-out period of six (6) months provided Lighthouse pays $81,000 per each month;

c. enjoining the Respondents from enforcing the restrictive covenants set forth in Section 19(d) of the Agreement that prohibits for a term of three (3) years from April 3, 2026, Petitioners to "(1) hire, solicit, recruit, induce, procure, work with, employ, or attempt to hire, solicit, recruit, induce, procure, work with, or employe, directly or indirectly, on behalf of the [Managers and Palm], any Lighthouse Protected Person; (2) go into business with, accept capital from, invest capital with, act as a consultant for, or employe as a consultant, or solicit or attempt to solicit for the purpose of any of the foregoing, directly or indirectly, (A) any Lighthouse Protected Person; (B) any client, former client or business relationship of Lighthouse or any of its affiliates that was introduced to [Palm of the Managers], directly or indirectly, by Lighthouse or any of its affiliates; or (c) any former employee(s) of Lighthouse or any of its affiliates; or (3) encourage any Lighthouse Protected Person to alter or terminate their relationship with [the Fund] or any affiliate of [the Fund] or Lighthouse; or in the alternative revise this convent to read: for a term of 12 months from April 3, 2026, Petitioners shall not solicit any current investor and employee of Lighthouse and its subsidiaries LH Penglai Peak, Co., Ltd. and LH Penglai Peak Pte. Ltd. provided that Lighthouse provides the names to Petitioners;

d. enjoining the Respondents from making any use of Petitioners' proprietary strategies and confidential client information;

e. enjoining the Respondents from directly or indirectly communicating with any of the investors in the Commingled Fund;

f. enjoining the Respondents from disparaging Petitioners or otherwise interfering with their business or employment prospects; and

g. enjoining the Respondents from taking any action based on Petitioners' refusal to provide Petitioners with the information and documents Respondents demanded that Petitioners provide to them by April 30, 2026 at 5:30 PM, except in connection with a confidential arbitration pursuant to the Agreement or in an audit or other review of the files by an independent, mutually agreeable third-party.

ii. Petitioners further request a temporary restraining order in aid of the preliminary injunction; and

iii. For such other and further relief as may be just, proper, and equitable.

Dated: New York, New York
April 30, 2026

30

Case 1:26-cv-03641-GHW    Document 1-1    Filed 05/01/26    Page 32 of 34

*Respectfully submitted*

FLORENCE ROSTAMI LAW LLC


By: __*/s/ Florence Rostami*____
Florence Rostami
frostami@rostamilaw.com
Neal Haber
nhaber@rostamilaw.com
420 Lexington Avenue, Suite 1402
New York, New York 10170
T: (212) 209-3962
*Attorneys for Petitioners*

IZOWER LEFTON LLP

Rachel Izower-Fadde
rizower@izowerlefton.com
1325 Franklin Ave Suite 255
Garden City NY 11530
(646) 688-3232
*Attorney for Petitioners*

31

## VERIFICATION

TAKASHI SHIMOYANAGITA, affirms the following to be true under the penalties of perjury, pursuant to Civil Practice Law and Rules 2106:

I am the Chief Investment Officer of Palm Investment Management Pte. Ltd. ("Palm"), the Petitioner in this action. I have read the annexed Petition, and its factual contents are true to my personal knowledge except as to the matters alleged on information and belief, and as to those matters, I believe them to be true.

The grounds for my belief as to all matters not stated upon my personal knowledge are based on the review of the books and records of Palm and discussions with officers and employees of Palm.

I affirm, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: Singapore
      April 30, 2026

                                      _____
                                    TAKASHI SHIMOYANAGITA

## **VERIFICATION**

YOHEI KITAZUMI, affirms the following to be true under the penalties of perjury, pursuant to Civil Practice Law and Rules 2106:

I am the Chief Executive Officer of Palm Investment Management Pte. Ltd. ("Palm"), the Petitioner in this action. I have read the annexed Petition, and its factual contents are true to my personal knowledge except as to the matters alleged on information and belief, and as to those matters, I believe them to be true.

The grounds for my belief as to all matters not stated upon my personal knowledge are based on the review of the books and records of Palm and discussions with officers and employees of Palm.

I affirm, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: Singapore
   April 30, 2026

                    YOHEI KITAZUMI